# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE | ) | |
| UNITED STATES, | ) | |
| 2100 L Street, NW | ) | No. _____ |
| Washington, DC 20037, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CARLOS M. GUTIERREZ, | ) | |
| Secretary of Commerce | ) | |
| U.S. Department of Commerce | ) | |
| 1401 Constitution Ave., NW | ) | |
| Washington, DC 20230, | ) | |
| | ) | |
| JAMES W. BALSIGER, | ) | |
| Acting Director | ) | |
| National Marine Fisheries Service | ) | |
| 1315 East-West Highway | ) | |
| Silver Spring, MD 20910, | ) | |
| | ) | |
| JAMES LECKY, | ) | |
| Director, Office of Protected Resources | ) | |
| National Marine Fisheries Service | ) | |
| 1315 East-West Highway | ) | |
| Silver Spring, MD 20910, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Sea lions eat fish. Each year, they eat between 0.4 and 4.2 percent of the 80,000 to 250,000 salmon and steelhead that spawn in the Columbia River. In comparison, fishermen are permitted to take approximately 9 to 12 percent, birds take 18 percent of juveniles, and hydroelectric dams take a whopping 59 percent of adults. Despite these impacts, Chinook salmon returns are expected to be so high this year (an approximately 200 percent increase from 2007),

that the States of Washington and Oregon have recently announced plans to increase fishing quotas 33 percent for 2008 – an increase from 9 percent to 12 percent of the total run, and more than three times the total consumption by sea lions.

2.    Nevertheless, the National Oceanic and Atmospheric Administration National Marine Fisheries Service's ("NMFS") has decided that sea lions in the Columbia River must be killed immediately to protect salmon, and has authorized state agents to shoot as many as 85 of the docile and federally protected marine mammals each year for 5 years – a total of 425 animals. The agency has authorized this killing under Section 120 of the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1389, which provides an exception to the MMPA's otherwise strict prohibition on the killing or harassment of *any* marine mammal, but only for those marine mammals that "are having a *significant negative impact* on the decline or recovery" of threatened or endangered salmon and steelhead populations. *Id.* § 1389(b) (emphasis added).

3.    Plaintiff's challenge the agency's finding that the sea lions' annual subsistence taking of 0.4 to 4.2 percent of the total salmon run is "significant" under the MMPA as an arbitrary and capricious decision under the Administrative Procedure Act. NMFS's decision to eradicate several hundred native animals to improve salmon runs by, at best,  a couple of percentage points is not only impossible to reconcile with the government's decision to *increase fishermen' share of the take to 12 percent of the Chinook run this season*, but also stands in stark contrast to many past NMFS' decisions finding that salmon taking far in excess of 4 percent by fishermen, tribes, and other resources users does *not* have a "significant" impact on the species.

4.     Accordingly, Plaintiff requests that the Court vacate the agency's facially inconsistent and unlawful decision, and enjoin any killing of sea lions until the agency has fully complied with the requirements of the MMPA.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

6.      Venue in this Court is proper under 28 U.S.C. § 1391(e).

## PARTIES

7.      Plaintiff The Humane Society of the United States ("The HSUS") is a non-profit organization headquartered in Washington, DC. The HSUS is the nation's largest animal protection organization, with over 10 million members and constituents, including over 360,000 members and constituents who reside in Oregon or Washington. The HSUS is committed to the goals of protecting, conserving, and enhancing the nation's wildlife and wildlands and fostering the humane treatment of all animals. In furtherance of these goals and objectives, The HSUS and its members have demonstrated a strong interest in the preservation, enhancement, and humane treatment of marine mammals, including California sea lions. The HSUS has been an active participant throughout the agency's proposal to lethally remove sea lions at Bonneville Dam. An HSUS employee served as a federally-appointed member of the Pinniped-Fishery Interaction Task Force convened to assist NMFS in its consideration.

8.      The HSUS brings this action on behalf of its members. HSUS members regularly enjoy viewing sea lions both near Bonneville Dam and further down the Columbia River. These members enjoy looking for, sighting, and observing the sea lions, and particularly enjoy observing individual animals that members have learned to recognize based on brands, tags, identifying natural markings, or personalities. These members have an emotional connection to the individual sea lions they have gotten to know, similar to the connection they feel to a family

pet. These members plan to continue identifying and observing their favorite individual sea lions in future.

9.      Other HSUS members live near Bonneville Dam ("the Dam"), regularly enjoy kayaking, hiking, and observing the Columbia River and the sea lions near and just down-river of the Dam. These members plan to continue boating, hiking, and observing the behavior of the sea lions near the Bonneville Dam in the future.

10.     The members' interests in observing, studying, and appreciating these sea lions, particularly the animals that they recognize individually, are injured by NMFS's decision to kill the sea lions at Bonneville Dam – likely some of the very animals the members regularly observe and recognize. If the individuals are killed, these members will no longer be able to observe and recognize their favorite individual animals. Even if the individual animals are not killed, the members will be emotionally affected by worrying about the animals' impending or possible deaths. These members' enjoyment in observing sea lions will be diminished, particularly as they look for the individual sea lions they recognize and are concerned that, if the animals are not there, they may have been shot.

11.     In addition, members who frequently boat and hike near the Bonneville Dam are concerned that their recreational enjoyment will be diminished by witnessing the killing, blood, or carcasses of sea lions in or near the water. They are also concerned that closures of portions of the river and adjacent recreational areas during the killing will prevent the members from recreating near the Dam. Also, if the agency is successful in reducing the number of sea lions that frequent the dam, these members' ability to sight and observe sea lions will also be limited.

12.     Vacating the agency's decision to kill the sea lions at Bonneville Dam will preserve both the lives of the individual animals that members recognize and retain the

4

recreational and emotional enjoyment the members receive from seeing the individual animals and recreating free from blood, carcasses, and killing.

13.    Defendant Carlos M. Gutierrez is the Secretary of Commerce and has ultimate responsibility for the programs of NMFS. Secretary Gutierrez is sued in his official capacity.

14.    Defendant James W. Balsiger is the Acting Director of NMFS, the agency within the Department of Commerce that has been delegated the responsibility for implementing the MMPA. Mr. Balsiger is sued in his official capacity.

15.    Defendant James Lecky is the Director of the Office of Protected Resources at NMFS. Mr. Lecky signed the Letters of Authorization at issue in this case. Mr. Lecky is sued in his official capacity

16.    Collectively, Defendants named in Paragraphs 13 to 15 above shall be referred to as "Defendants" or "NMFS" in this Complaint.

## STATUTORY BACKGROUND

### A.    The Marine Mammal Protection Act

17.    The Marine Mammal Protection Act ("MMPA" or "Act") represents Congress' most expansive explication of the nation's commitment to the "protection and conservation" of sea lions and other marine mammals. 16 U.S.C. § 1361(5). Its primary purpose is to remedy "man's . . . malign neglect and virtual genocide" of marine mammals, and to promote "solicitous and decent treatment" of "polar bears, manatees and other [animals that] have been shot, blown up, clubbed to death, run down by boats, poisoned, and exposed to a multitude of other indignities, all in the interest of profit or recreation." H.R. Rep. No. 92-707, 92nd Cong., 2nd Sess. 1 (1971).

18.    To fulfill this purpose, the MMPA establishes a strict moratorium on the taking and importation of all marine mammals and marine mammal products. 16 U.S.C. § 1371(a). The Act defines "take" as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13).

19.    In 1994, Congress enacted a limited exemption to the prohibition on taking marine mammals. Section 120 of the MMPA authorizes the Secretary of Commerce, upon the filing of an application by a state, to "permit the intentional taking of individually identifiable pinnipeds" – a grouping of marine mammals that includes walruses, sea lions, fur seals, and true seals – if the Secretary determines that the pinnipeds are having a "significant negative impact on the decline or recovery" salmon stocks listed as endangered or threatened. 16 U.S.C. § 1389(b).

20.    Consistent with the MMPA's narrow limitation on the take of marine mammals, Section 120 establishes a specific procedure and sets out a series of determinations the Secretary must make before permitting the take of pinnipeds.

21.    Upon receiving a Section 120 application from a state, NMFS must determine whether the application contains "sufficient evidence to warrant establishing a Pinniped-Fishery Interaction Task Force." 16 U.S.C. 1389(c)(1). Specifically, the Secretary must consider whether the application "include[s] a means of *identifying individual pinniped* or pinnipeds, and . . . include[s] a detailed description of the problem interaction and *expected benefits of taking*." *Id.* § 1389(b)(2) (emphases added).

22.    If warranted, NMFS must publish a Federal Register notice requesting comments on the application and convene a Pinniped-Fishery Interaction Task Force. The task force is assigned to "recommend to the Secretary whether to approve or deny the proposed intentional lethal taking of the pinniped or pinnipeds," and provide "a description of the specific pinniped

individual or individuals, the proposed location, time, and method of taking, criteria for evaluating the success of the action, and the duration of the intentional taking authority." *Id*. § 1389(c)(3). The task force must also "suggest nonlethal alternatives." *Id*.

23.    Upon receipt of the task force's recommendations, the Secretary must decide whether to approve or deny the application. The MMPA provides very specific findings the agency must make before lethal action may be authorized. First, the Secretary may *only* authorize the lethal taking of "individually identifiable pinnipeds which are having a *significant negative impact* on the decline or recovery of salmonid fishery stocks which . . . have been listed as threatened species or endangered species" under the Endangered Species Act ("ESA"). *Id.* § 1389(b)(1)(A) (emphasis added). Also, the Secretary "shall consider: (1) population trends, feeding habits, the location of the pinniped interaction, how and when the interaction occurs, and how many individual pinnipeds are involved; (2) past efforts to nonlethally deter such pinnipeds, and whether the applicant has demonstrated that no feasible and prudent alternatives exist and that the applicant has taken all reasonable nonlethal steps without success; (3) the extent to which such pinnipeds are causing undue injury or impact to, or imbalance with, other species in the ecosystem, including fish populations; and (4) the extent to which such pinnipeds are exhibiting behavior that presents an ongoing threat to public safety." *Id*. § 1389(d)(1)–(4).

24.    If, after considering the task force's recommendation, NMFS approves the application, lethal take may occur.

25.    The MMPA also strongly emphasizes the humane treatment of marine mammals. Defining "humane," the Act states: "in the context the taking of a marine mammal . . . that method of taking which involves the least possible degree of pain and suffering practicable to the mammal involved." 16 U.S.C. § 1362(4); *see also id*. § 1374(b)(2)(B) (in order to issue take

permits, Secretary "shall . . . specify . . . the location and manner (which must be determined by the Secretary to be humane) in which they may be taken"); *id.* § 1379(h) (authorizes states, federal agencies, and local governments to take marine mammals for the protection of the mammal or public health "in a humane manner (including euthanasia)").

26.     Congress consistently expressed its intent that the lethal removal of pinnipeds under Section 120 be done in a humane manner. *See* S. Rep. 103-220, at 18 (1994) (the "new section . . . of the MMPA [will] govern the lethal and *humane* removal of identifiable nuisance pinnipeds") (emphasis added); 140 Cong. Rec. S3288, S3296 (1994) (statement of Senator Kerry) (same).

**B.     The National Environmental Policy Act**

27.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. The critical purposes of the statute include "insur[ing] that environmental information is available to public officials and citizens before decisions are made and actions are taken," and "help[ing] public officials make decisions that are based on understanding of environmental consequences." *Id.* § 1500.1(b)-(c). "Public scrutiny [is] essential to implementing NEPA." *Id.*

28.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement is known as an Environmental Impact Statement ("EIS").

29.     The EIS must detail, among other things, "the environmental impact of the proposed action" and "alternatives to the proposed action." *Id.* NEPA further requires that agencies must "study, develop, and describe appropriate alternatives to recommended courses of

action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E).

30.     NEPA's implementing regulations elaborate on these statutory requirements. The regulations provide that agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The regulations further provide that "[a]gencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." *Id.* § 1502.24.

31.     NEPA requires that when an agency proposes to undertake an "action," the agency "must first determine whether the action is one that normally requires" the preparation of an EIS pursuant to NEPA and its implementing regulations. 40 C.F.R. § 1501.4(a).

32.     If the agency is not certain whether an EIS is required, it must prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary. *Id*. § 1501.4. The EA must discuss the need for the proposal, evaluate alternatives that would cause less adverse environmental impacts, and provide sufficient evidence and analysis to support the agency's determination as to whether the proposed action will significantly affect the environment. *Id.*

33.     In the EA, the agency must consider a number of factors to determine whether an action has a "significant" effect on the environment to trigger preparation of an EIS. These factors include: (1) "[i]mpacts that may be both beneficial and adverse," even if the action on the whole is beneficial, (2) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," (3) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," (4) "[w]hether the action threatens a violation of Federal, State, or local law or requirements

imposed for the protection of the environment," and (5) "[t]he degree to which the action may adversely affect an endangered or threatened species." *Id*. § 1508.27(b)

## FACTUAL BACKGROUND

### A.   Listed Salmonids in the Columbia River Basin

34.   The Columbia River, which marks part of the border between Oregon and Washington State, runs from British Columbia to the Pacific Ocean. Its largest tributary, the Snake River, runs through Idaho until its confluence with the Columbia River near Richland, Washington.

35.   "Salmonids" refer to the family *salmonidae*, which includes several species of salmon, as well as steelhead (also called rainbow) trout. Salmonids are anadromous fish, meaning they migrate up rivers from the ocean to breed in fresh water.

36.   Due to numerous threats and declining populations, in 1992, NMFS began listing certain salmonids as threatened or endangered under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544.

37.   Instead of listing the whole species, NMFS instead listed "distinct population segments" ("DPSs"), or subsets, of salmonid species. 16 U.S.C. §§ 1533(a)(1); 1532(16). NMFS considers a stock of salmon to be a DPS if it "represents an evolutionarily significant unit" of the species. 58 Fed. Reg. 58,612, 58,618 (Nov. 20, 1991); 61 Fed. Reg. 4722, 4722 (Feb. 7, 1996).

38.   NMFS has listed thirteen evolutionarily significant units ("ESUs") of salmonids in the Columbia River basin as threatened or endangered. Final Environmental Assessment on Reducing the Impact on At-risk Salmon and Steelhead by California Sea Lions in the Area Downstream of Bonneville Dam on the Columbia River (2008) 3-16. These ESUs are typically

distinguished by their run – the seasonal timing when a stock leaves the ocean and migrates upriver to breed.

39.     Five of the thirteen listed Columbia River ESUs are implicated in this case due to the overlap between the timing of their run and the presence of California sea lions at Bonneville Dam. Final EA 3-19. These ESUs include all naturally spawned and certain artificially propagated fish of the following runs: Upper Columbia River Spring-run Chinook (endangered), Snake River Spring/Summer-run Chinook (threatened), Snake River Basin Steelhead (threatened), Middle Columbia River Steelhead (threatened), and Lower Columbia River Steelhead (threatened). *Id.*; 70 Fed. Reg. 37,160 (June 28, 2005) (listing rule); 50 C.F.R. § 223.102(a) (listing threatened salmonid ESUs); 50 C.F.R. § 224.101(a) (listing endangered salmonid ESUs).

40.     Although salmonid populations in the Columbia River have long been in decline and continue to face a multitude of threats, returns Upper Columbia Spring-run and Snake River Spring/Summer run Chinook in the Columbia River are expected to increase more than 200 percent in 2008 over the 2007 numbers.

41.     Hydropower development has dramatically affected the status of salmonids. Numerous dams lie along the Columbia River and its tributaries. For example, endangered Upper Columbia Spring-run Chinook breeding north of the Wenatchee River must navigate over seven dams. *See* Upper Columbia River Spring Chinook Salmon and Steelhead Recovery Plan (2007) at 90. NMFS estimates that 4 percent of adult salmon and steelhead can be lost *at each dam*. *Id.*

42.     In addition to direct mortality, dams also indirectly kill salmonids by blocking access to spawning and rearing habitat and altering riparian habitat, temperature, flood events and thus nutrient input.

43.     The Final EA provides estimates for the base mortality resulting from the Federal Columbia River Power System for each ESU: (1) 9.9 percent of adult Upper Columbia River Spring-run Chinook taken in dams and 35.4 percent of juveniles, (2) 15.4 percent of adult Snake River Spring/Summer-run Chinook and 51.5 percent of juveniles, (3) 16.8 percent of adult Snake River Basin Steelhead and 59.9 percent of juveniles, (4) 7.1 percent of adult Middle Columbia River Steelhead and 2.3 percent of juveniles, and (5) 7.1 percent of Lower Columbia River Steelhead and 2.3 percent of juveniles. Final EA 3-32.

44.     As part of its 2007 Federal Columbia River Power System and Upper Snake River Biological Opinion, NMFS specifically acknowledges and authorizes such levels of take – *i.e.*, upwards of 35 percent – as *not* jeopardizing the various salmonid ESUs.

45.     Fisheries are another major source of salmonid mortality.

46.     While intentional taking of an endangered salmonid, whether naturally-spawned or hatchery-raised, is prohibited under Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B), NMFS has exempted certain hatchery-spawned fish that are listed as threatened from that prohibition. Take is prohibited for all naturally-spawned threatened salmon, but for hatchery-raised threatened salmonids, take is only prohibited if the fish have "an intact adipose fin." 50 C.F.R. § 223.203(a). The adipose fin is a small fin towards the rear of the fish, and clipping that fin is a common way of marking hatchery raised fish prior to release into the wild. 70 Fed. Reg. 37,160, 37,194 (June 28, 2005). The take prohibition does not apply to threatened hatchery fish that have had their adipose fin "clipped," and these "adipose-fin-clipped hatchery fish" can thus be harvested by fisheries. *Id.*

47.     Although NMFS authorizes the harvest of only adipose fin-clipped threatened salmonids, the incidental take of threatened and endangered fish with *intact* adipose fins still

occurs. Mortality occurs from both the hooking or netting and subsequent retention of fish, but also when a fish is caught and released alive. *See* Biological Opinion on Impacts of Treaty Indian and Non-Indian Fisheries in the Columbia River Basin in Years 2005-2007, on Salmon and Steelhead Listed under the Endangered Species Act, Conference on Lower Columbia Coho, and Magnusson-Stevens Act Essential Fish Habitat Consultation (2005), at 87 ("2005-2007 Interim Mgmt. Agmt. BiOp"). NMFS estimates that 10 percent of listed fish caught and released during recreational fishing die, 1 percent of fish die after being caught in a dip net, 18.5 percent from selective tanglenet, and 30 percent from selective gillnet fisheries. *Id*.

48.    NMFS regulates the number of incidental takes allowed from in-river sport and commercial fishing by both tribal and non-tribal entities, as well as ocean fishing. NMFS's 2005-2007 Interim Management Agreement Biological Opinion describes the level of take allowed by the mainstem Columbia fisheries. In it, NMFS allows up 17 percent of the natural origin Upper Columbia River Spring-run Chinook and Snake River Spring/Summer-run Chinook salmon runs to be taken, depending on the total run size. *Id*. at 88; Final EA 3-32. According to the Final EA, NMFS also allows up to 6 percent of both the Middle Columbia River and Lower Columbia River Steelhead natural-origin runs to be incidentally taken. *Id*. at 3-32. Finally, NMFS limits non-indian fisheries to 4 percent of the Snake River Steelhead natural runs (2 percent for winter, summer, and spring fisheries and 2 percent of fall fisheries), and limits tribal fisheries to 15 percent of the B-run steelhead. 2005-2007 Interim Mgmt. Agmt. BiOp at 112; Final EA 3-32.

49.    In its Interim Management Agreement Biological Opinion, NMFS determined that these levels of take – *i.e.*, up to nearly 20 percent – would not jeopardize the various ESUs. 2005-2007 Interim Mgmt. Agmt. BiOp at 118.

50.     For the 2008 season, the states of Oregon and Washington expect the third largest run of listed both Upper Columbia Spring-run Chinook and Snake River Spring/Summer run Chinook since 1980. *See* Joint 2008 Staff Report: Stock Status and Fisheries for Spring Chinook, Summer Chinook, Sockeye, Steelhead, and Other Species (2008) at 16. Based on these forecasts, the states anticipate allowing 12 percent of the runs to be incidentally taken by tribal and non-tribal fisheries, in accordance with the 2005-2007 Interim Management Agreement. *Id*. at 41.

51.     While ocean harvest of steelhead is relatively rare, NMFS estimates that ocean fisheries take "likely less than 1 percent" Spring and Summer run Chinook. 2005-2007 Interim Mgmt. Agmt. BiOp at 112. Other runs are substantially impacted by ocean fisheries. For example, NMFS estimates that in 2004, nearly 36 percent of the certain listed, wild Lower Columbia River Chinook stocks were taken by ocean fisheries each year. *Id.* at 80.

52.     Predation presents another source of salmonid mortality. Other fish, including adult salmonids, northern pikeminnow, walleyes, and smallmouth bass, consume juvenile salmonids. 2007 Upper Columbia Recovery Plan at 94. Predation by birds, such as great blue herons, gulls, and osprey can also impact populations. *Id.* For example, NMFS estimates that avian predators consumed 18 percent of smolts, or juvenile salmonids, reaching the Columbia River estuary in 1998. *Id.* Mammals, including sea lions, raccoons, river otters, mink, black bears, and harbor seals, also consume salmonids. *Id.* Of the mammals, the Upper Columbia River Chinook and Steelhead Recovery Plan from 2007 highlights river otters and black bears as being particularly capable of consuming large numbers of salmonids. *Id.*

53.     Hatcheries are also harmful to wild-run salmon and steelhead populations. In addition to consuming and competing with wild-run fish, hatchery fish may transmit hatchery-borne disease, and interbreeding can affect genetic variability. 2005-2007 Interim Mgmt. Agmt.

BiOp at 78. NMFS's 2007 Final Recovery Plan for Upper Columbia Spring-run Chinook Salmon and Steelhead noted hatcheries as one of the main factors in the population decline, explaining that hatchery fish may "affect diversity and productivity of naturally produced stocks," and also "ecological effects that reduce the abundance and productivity of populations," including "altered body size and survival of naturally produced fish." *Id.* at 89.

54.    Scientific research also impacts ESA-listed salmonids. NMFS authorizes numerous research projects each year, allowing the harassment and take of listed fish. As NMFS's 2005 Interim Management Agreement BiOp states, "the sum of the authorized [research-related] takes indicates a high level of research effort . . ., and as anadromous fish stocks have continued to decline, the proportion of fish handled for research/monitoring purposes have increased." *Id.* at 84.

55.    Further, farming, mining, forestry practices, grazing, road construction, and urban development have degraded the quality and quantity of freshwater habitats. *See* 2005-2007 Interim Mgmt. Agmt. BiOp at 74. These indirect effects are difficult, if not impossible, to quantify.

56.    The ESA requires NMFS to develop a recovery plan for each listed species. 16 U.S.C. § 1533(f)(1). Although some of the salmonids affected by NMFS's proposal have been listed since the mid-1990's, NMFS has only finalized a single Recovery Plan – for the Upper Columbia River Spring-run Chinook. Final EA 3-30.

**B.    California Sea Lions in the Columbia River Basin**

57.    California sea lions (*Zalophus californianus californianus*) are large marine mammals with a range from southern Mexico to southeast Alaska. Final EA 3-3. Known for their

dog-like features, male California sea lions can grow to 1000 pounds and 8 feet long. Females can grow to 6 feet long, but typically only reach 300 pounds.

58.    Breeding for California sea lions typically occurs on or near the Channel Islands, off the coast of southern California. Females are rarely observed north of the California-Oregon border, but males migrate further north after breeding. *Id*. Male sea lions reach the mouth of the Columbia River in early February.

59.    Official counts of California sea lions at Bonneville Dam began in 2002. NMFS estimates that around 30 sea lions were present in 2002; the number jumped to 106 in 2003 and has decreased annually to 72 sea lions in 2006. Final EA 3-7. The sea lions arrive at the Dam in mid-February and typically leave the Columbia River to return to breeding grounds by late May. *Id.*

60.    California sea lions consume a number of different types of fish in the Columbia River, including salmonids. They also consume other fish species that prey on salmonids. The Final EA indicates that observed salmonid consumption by sea lions at the Bonneville Dam varies depending on run size, ranging from 0.4 percent of the run in 2002, to 3.4 percent in 2005, down to 2.8 percent in 2006, and 4.2 percent in 2007. Final EA 3-13; 1-5.

### C.    Section 120 and the Ballard Locks Situation

61.    Congress enacted Section 120 of the MMPA primarily in reaction to a particular instance of pinniped predation of steelhead occurring at Ballard Locks in Seattle, Washington. *See* 140 Cong. Rec. S3288-01, S3299 (1994) (statement of Senator Kerry explaining Section 120 was added to "address a decade-long problem in Washington State" and describing the Ballard Locks situation in detail); S. Rep. 103-220 (1994) (Section 120 "was developed in response to

predation by nuisance pinnipeds of fish runs at Ballard Locks and Columbia River in Washington State").

62.    The Ballard Locks control the water level in the Lake Washington shipping canal. In 1993-1994, the season prior to the MMPA's enactment, the winter-run steelhead run at Ballard Locks had diminished from its historic run of 2500 fish per year to only 70 fish. *See* Environmental Assessment on Protecting Wild-Run Steelhead from Predation by California Sea Lions in the Lake Washington Ship Canal, January 1995 ("Ballard EA") at 4. Marking the lowest run on record, NMFS had instituted a variety of measures, including first limiting and then completely closing both sport and tribal fisheries, improving fish passage, and altering flow to improve the abundance of steelhead populations.

63.    In previous seasons, sea lions had consumed between 42 and 65 percent of the steelhead run, and NMFS determined that "sea lion predation, *by itself*, ha[d] been documented to have prevented achievement" of steelhead spawning conservation measures. Ballard EA 3-4 (emphasis added).

64.    After Congress responded to this situation by enacting Section 120, the agency applied the new Section to address the situation at Ballard Locks. NMFS ultimately proposed a limited lethal take of sea lions through capture and euthanasia. Ballard EA, 89. However, NMFS stipulated that lethal removal *could not commence* until "the sea lion predation rate exceed[ed] *10 percent* of the steelhead passing on any consecutive 7-day period." *Id*. Then, after lethal removal was initiated, if the predation rate fell below 10 percent for any consecutive 14-day period, lethal removal had to cease. *Id*. NMFS estimated only 15 sea lions would be taken, and required that, if at any point, 15 were lethally removed, the task force had to re-convene and evaluate the situation. Ballard EA 91.

65.    Prior to the current action at Bonneville Dam, the Ballard Locks situation was the only other time NMFS issued a Section 120 authorization.

**D.    NMFS's Proposal to Kill Sea Lions at Bonneville Dam**

66.    On January 30, 2007, NMFS published a Federal Register notice disclosing that it had received a Section 120 application from the states of Oregon, Washington, and Idaho requesting authorization to kill sea lions at Bonneville Dam. 72 Fed. Reg. 4239 (Jan. 30, 2007). Pursuant to Section 120, NMFS had determined that the States' application contained sufficient information to warrant convening a "Pinniped-Fishery Task Force" ("the Task Force") to consider the application. *Id.* at 4239. NMFS solicited comments on the proposal and nominations for possible Task Force members.

67.    The States' application proposed to lethally remove an unidentified number of California sea lions if the animals were observed above Columbia River Navigation Marker 85, or within approximately 6 miles downriver of Bonneville Dam. *See* Oregon Department of Fish and Wildlife, Washington Department of Fish and Wildlife, and Idaho Department of Fish and Game Request for MMPA Section 120 Pinniped Removal Authority, Nov. 2006 ("States' Section 120 Application") at 1. In addition to proposing the killing of any animal observed above Marker 85, the States also proposed that "all individually marked California sea lions that have been documented feeding on salmonids at Bonneville Dam" could be candidates for removal regardless of where they were actually found on the river. *Id*.

68.    Despite the MMPA's requirement that any Section 120 application "shall include a means of identifying the individual pinniped or pinnipeds," 16 U.S.C § 1389(b)(2), the States' application claimed that "[a]ll California sea lions above Navigation Marker 85 forage for salmonids and as such are 'identifiable.'" States' Section 120 Application at 6. Despite the

MMPA's requirement that an application "include a detailed description . . . of the expected benefits of the taking," 16 U.S.C. § 1389(b)(2), the entirety of the States' description of the expected benefit was simply: "to reduce a recent, unnatural, and significant source of mortality that has jeopardized the States' ongoing efforts to recover ESA-listed salmonids in the Columbia River Basin." No further analysis was provided. States' Section 120 Application at 1.

69. On March 15, 2007, HSUS submitted extensive comments on the application.

70. Among the 18 members of the task force selected by NMFS to recommend whether or not to approve the application of the states of Idaho, Washington, and Oregon, were representatives of two of the applicant states (Oregon and Washington), 5 representatives from tribes who fish for salmonids each season, 2 representatives from sport fishing groups, two representatives from NMFS, a retired NMFS biologist, a representative from the Army Corps of Engineers who operate Bonneville Dam, a fishery biologist, a retired marine mammal biologist, a representative of a Columbia River watershed protection organization,  the Oregon Zoo, and HSUS's Marine Issues Field Director, Sharon Young. The Task Force convened on three occasions: on September 4–5, 2007, October 9–10, 2007, and October 30-31, 2007.

71. Although the Task Force was unable to reach consensus on the application, it nevertheless issued a "majority" opinion recommending approval of the States' application. Task Force Report at 6.

72. The majority of the Task Force recommended two alternatives for lethal take. The more restrictive option would allow a California sea lion to be killed under a number of scenarios, including if the sea lion: (1) is observed eating a *single salmon* in the area directly below Bonneville Dam, or (2) has been observed taking a single salmon and has been observed any 7 non-consecutive days in the 6 mile area between navigation marker 85 and the Bonneville

dam. *Id*. at 11–12. The less restrictive alternative would allow the killing of *any* sea lion – even if it had never been observed taking a fish – if it swims past navigation marker 85. *Id*. at 14. The report blatantly acknowledged that this recommendation "allow[s] an immediate lethal take of [some] sea lions *without a requirement of individual identification*." *Id*. at 12 (emphasis added).

73.    Although specifically asked by the agency to provide advice on how to determine whether the sea lions are having a "significant negative impact" on salmonid decline, the Task Force was unable to agree on a quantitative standard. *Id*. at 10. Instead, the Task Force agreed on a number of vague questions to serve as "criteria," including whether pinniped presence at the Dam coincides with presence of ESA listed salmonids, whether predation has increased beyond historical levels, whether predation is likely to continue if "the impact remains unchecked," and whether salmonid mortality is "comparable to other forms of in-river mortality that is currently being managed." *Id*. at 10–11.

74.    The Marine Mammal Commission ("MMC"), an entity created by the MMPA to advise NMFS on scientific matters, submitted extensive comments on the Task Force's recommendations. MMC Nov. 23, 2007 Letter to Mr. Lohn, Regional Administrator of NMFS. Among its suggestions, the MMC recommended that: (1) NMFS "articulate a quantitative standard" for determining significance of sea lion predation on the decline or recovery of salmonid populations, and offering several quantitative standards as options; (2) if NMFS's standard for Bonneville Dam differs from the standard applied at Ballard Locks, NMFS should explain the disparity; (3) NMFS compare the level of salmonid predation to the level of take from other sources and "explain why some sources are considered significant while others are not;" (4) NMFS identify a predation level at which NMFS would no longer consider sea lion predation to be significant; and (5) NMFS reject any proposal to kill sea lions simply because

they enter a geographic area, expressing concerns regarding whether that would comply with the MMPA's "individually identifiable" requirement. *Id.* at 1, 4.

75.     The MMC concluded by recommending that NMFS "adhere to the requirements of section 120 . . . in this instance, and if [NMFS] believes that greater flexibility is need to address the predation problem at Bonneville Dam," the agency should explore other provisions of the MMPA. *Id.* at 2.

76.     On January 18, 2008, NMFS published a notice of availability of a Draft Environmental Assessment Considering the States of Oregon, Idaho, and Washington's Request for Lethal Removal Authority of California Sea Lions in Accordance with the Marine Mammal Protection Act. ("Draft EA"). 70 Fed. Reg. 3453 (Jan. 18, 2008).

77.     In the Draft EA, NMFS considered four alternatives: (1) a no action alternative, (2) continued non-lethal deterrence only, (3) lethal removal of up to 85 California sea lions, or the number of sea lions necessary to lower the observed predation rate to less than 1 percent after non-lethal removal (the Preferred Alternative), or (4) lethal removal of between 150 and 170 sea lions, or the number of sea lions necessary to lower the observed predation rate to less than 0.5 percent. Draft EA 2-6–16.

78.     On February 19, 2008, HSUS submitted extensive comments on NMFS's Draft EA.

79.     On March 18, 2008, NMFS issued a Final EA, a Finding of No Significant Impact ("FONSI") under NEPA, and identical Letters of Authorization ("LOA") to Washington, Oregon, and Idaho, granting the states authority to lethally take sea lions under Section 120. NMFS selected a modified Alternative 3. Final EA P-1.

80.     Under the selected alternative, the Letters of Authorization allow the States to remove *each year* up to one percent of the Potential Biological Removal level ("PBR") set for California sea lions. Based on the current PBR level for California sea lions, the States may remove up to 85 sea lions this year. This number will vary as NMFS annually resets the PBR level for California sea lions.

81.     NMFS authorizes the states to either trap and euthanize sea lions or to shoot the animals while they are in water. Final EA 4-7. NMFS specifically contemplates animals being "wounded but not killed" by gun shot. *Id*. While the states are required to follow a protocol set by an Animal Care Committee for capturing and euthanizing sea lions, NMFS specifies the weaponry and manner in which the animals must be shot. LOA 2–3.

82.     Acknowledging the MMPA's requirements that lethal take only be permitted for "individually identifiable" sea lions "which are having a *significant negative impact* on the decline or recovery" of threatened or endangered salmonid fishery stocks, the Final EA and NMFS's unpublished Federal Register Notice describe how NMFS believes its proposals satisfy the requirements. Final EA 2-2; Federal Register Notice (RIN 0648-XB83).

83.     In determining whether sea lions are having a "significant negative impact on the decline or recovery" of listed salmonids, 16 U.S.C. § 1389(b)(1), NMFS expressly rejected the MMC's recommendation to adopt a quantitative standard. While NMFS acknowledged that there were several options for quantifying "significance," including calculating "the extent to which pinniped predation increases extinction risk or delays the recovery of salmon," comparing NMFS's prior ESA consultations as guide, or considering whether predation slows recovery of salmon populations by more than 10 percent (a common method for determining significance under the MMPA), NMFS summarily rejects these or any quantitative proposals and instead

adopts the Task Force's vague "criteria," as well as an ill-defined "totality of circumstances" approach. Final EA 2-4.

84.     In response to the MMPA's requirement that NMFS only authorize the removal of "individually identifiable pinnipeds which are having a significant negative impact" on salmonid decline, 16 U.S.C. § 1389(b)(1), the LOA limits take to: any "identifiable" animal (having features that distinguish them from other sea lions) who has been seen eating a salmonid between January 1 to May 31 *of any year*, has been observed below the Bonneville Dam for "any 5 days (consecutive days, days within a single season, or days over multiple years)," and has been sighted below the Dam after being subjected to non-lethal deterrence. LOA at 2. NMFS does not explain how being observed near the dam and consuming a single fish means that an animal is having "a significant negative impact" on salmonid decline.

85.     In considering the impacts of its proposal, NMFS claims that the indirect effects of its selected alternative would "likely be an increase in survival (and hence an increase in abundance and a decrease in the level of extinction risk)," compared to taking no action. Final EA 4-11. NMFS estimates that killing the sea lions could result in anywhere between 601 to 6,090 fewer fish being consumed, or 0.3 to 4.4 percent of the listed salmonid runs. *Id.* 1-5. NMFS's final estimates are lower than the estimates provided in the Draft EA, which predicted killing sea lions to affect 0.5 to 7.2 percent of listed salmonid runs. Draft EA 1-5.

86.     The Final EA immediately qualifies these estimates, noting that "[t]hese possibilities are too uncertain . . . to support a reliable estimate of any decrease in pinniped predation (and corresponding increase in salmonid survival)." Final EA 4-11. Further, the Final EA notes, "it likely that other sea lions would eventually replace the sea lions lethally removed,

so the increase in the number of salmonids passing Bonneville Dam would likely be less than the numbers" estimated by the agency. *Id.*

87.    In considering the cumulative impacts, the Final EA concludes the proposal will not have cumulative impacts on sea lions due to the low number of sea lions taken compared to the population. *Id.* at 5-1. For salmonids, the EA concludes that the action "would make a measurable contribution to improving survival of returning adult salmonids," but does not actually estimate what that "measurable contribution" to "survival" might be. *Id*. at 5-3.

## PLAINTIFF'S CLAIMS FOR RELIEF

### Claim 1: Violations of the MMPA and the APA

88.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs 1–87 above.

89.    By authorizing the killing of up to 425 sea lions over the next five years, NMFS has violated Marine Mammal Protection Act by: (1) authorizing lethal take without adequately determining whether predation is having a "significant negative impact on the decline or recovery" of listed salmonids, (2) authorizing lethal take even though sea lion predation is not having a demonstrably "significant negative impact on the decline or recovery" of listed salmonids, (3) authorizing lethal take of animals that NMFS has not "individually identified" as having a significant negative impact on salmonid decline, and (4) authorizing take in a method that is not humane. 16 U.S.C. § 1389. NMFS's decision to authorize the lethal removal of sea lions at Bonneville Dam in violation of the substantive requirements of the MMPA is thus arbitrary, capricious, and not in accordance with the law, and must be set aside. 5 U.S.C. § 701-706.

90.     Defendants' actions have injured, and will continue to injure, Plaintiff and its members in the manner described in paragraphs 8–12 above.

### Claim 2: Violations of NEPA and the APA

91.     Plaintiff incorporates herein by reference all of the allegations contained in paragraphs 1–87 above.

92.     By authorizing the killing of up to 425 sea lions over the next five years without first: (1) preparing an Environmental Impact Statement, or in the alternative (2) preparing an adequate Environmental Assessment under the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, NMFS has violated NEPA and its implementing regulations, abused the agency's discretion, and acted arbitrarily and capriciously in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

93.     Defendants' actions have injured, and will continue to injure, Plaintiff and its members in the manner described in paragraphs 8–12 above.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter an order:

1.     declaring Defendants' decision to authorize the lethal removal of sea lions at Bonneville Dam to be unlawful under the Marine Mammal Protection Act, 16 U.S.C. §§ 1362–1421h, and the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370f, and an "arbitrary and capricious" agency action under Administrative Procedure Act, 5 U.S.C. §§ 551–706;

2.     awarding Plaintiff its reasonable attorneys' fees and costs for this action; and

3.     granting Plaintiff such other and further relief as may be just and proper.

Respectfully Submitted,

Rebecca G. Judd
DC Bar No. 486315

Sarah Uhlemann
DC Bar No. 501328

Jonathan R. Lovvorn
D.C. Bar No. 461163
The Humane Society of the United States
2100 L Street, N.W.
Washington, DC 20037
(202) 452-1100

*Attorneys for Plaintiff*
*The Humane Society of the United States*

March 20, 2008

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| The Humane Society of the United States | Secretary of Commerce Carlos Gutierrez; Acting Director of National Marine Fisheries Service James Balsiger; Director of Office of Protected Resources of National Marine Fisheries Services James Lecky |

| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     11011  (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT      11011  (IN U.S. PLAINTIFF CASES ONLY)  NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)  Rebecca G. Judd  The Humane Society of the United States  2100 L Street, NW  Washington, DC  20037  (202) 452-1100 | ATTORNEYS (IF KNOWN) |
|---|---|

## II. BASIS OF JURISDICTION
(PLACE AN X IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

◉ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

| ○ **A.** *Antitrust* | ○ **B.** *Personal Injury/ Malpractice* | ◉ **C.** *Administrative Agency Review* | ○ **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane  ☐ 315 Airplane Product Liability  ☐ 320 Assault, Libel & Slander  ☐ 330 Federal Employers Liability  ☐ 340 Marine  ☐ 345 Marine Product Liability  ☐ 350 Motor Vehicle  ☐ 355 Motor Vehicle Product Liability  ☐ 360 Other Personal Injury  ☐ 362 Medical Malpractice  ☐ 365 Product Liability  ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act  **Social Security:**  ☐ 861 HIA ((1395ff)  ☐ 862 Black Lung (923)  ☐ 863 DIWC/DIWW (405(g)  ☐ 864 SSID Title XVI  ☐ 865 RSI (405(g)  **Other Statutes**  ☐ 891 Agricultural Acts  ☐ 892 Economic Stabilization Act  ☒ 893 Environmental Matters  ☐ 894 Energy Allocation Act  ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.  *(If Antitrust, then A governs)* |

| ○ **E.** *General Civil (Other)* | **OR** | ○ **F.** *Pro Se General Civil* | |
|---|---|---|---|

| **Real Property**  ☐ 210 Land Condemnation  ☐ 220 Foreclosure  ☐ 230 Rent, Lease & Ejectment  ☐ 240 Torts to Land  ☐ 245 Tort Product Liability  ☐ 290 All Other Real Property  **Personal Property**  ☐ 370 Other Fraud  ☐ 371 Truth in Lending  ☐ 380 Other Personal Property Damage  ☐ 385 Property Damage Product Liability | **Bankruptcy**  ☐ 422 Appeal 28 USC 158  ☐ 423 Withdrawal 28 USC 157  **Prisoner Petitions**  ☐ 535 Death Penalty  ☐ 540 Mandamus & Other  ☐ 550 Civil Rights  ☐ 555 Prison Condition  **Property Rights**  ☐ 820 Copyrights  ☐ 830 Patent  ☐ 840 Trademark  **Federal Tax Suits**  ☐ 870 Taxes (US plaintiff or defendant  ☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**  ☐ 610 Agriculture  ☐ 620 Other Food &Drug  ☐ 625 Drug Related Seizure of Property 21 USC 881  ☐ 630 Liquor Laws  ☐ 640 RR & Truck  ☐ 650 Airline Regs  ☐ 660 Occupational Safety/Health  ☐ 690 Other  **Other Statutes**  ☐ 400 State Reapportionment  ☐ 430 Banks & Banking  ☐ 450 Commerce/ICC Rates/etc.  ☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations  ☐ 480 Consumer Credit  ☐ 490 Cable/Satellite TV  ☐ 810 Selective Service  ☐ 850 Securities/Commodities/ Exchange  ☐ 875 Customer Challenge 12 USC 3410  ☐ 900 Appeal of fee determination under equal access to Justice  ☐ 950 Constitutionality of State Statutes  ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. _Habeas Corpus/_ _2255_** | ○ **H. _Employment_ _Discrimination_** | ○ **I. _FOIA/PRIVACY_ _ACT_** | ○ **J. _Student Loan_** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General <br> ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment <br> (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act <br> ☐ 890 Other Statutory Actions (if Privacy Act) <br><br><br> *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. _Labor/ERISA_** **_(non-employment)_** | ○ **L. _Other Civil Rights_** **_(non-employment)_** | ○ **M. _Contract_** | ○ **N. _Three-Judge Court_** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt. Reporting & Disclosure Act <br> ☐ 740 Labor Railway Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) <br> ☐ 443 Housing/Accommodations <br> ☐ 444 Welfare <br> ☐ 440 Other Civil Rights <br> ☐ 445 American w/Disabilities-Employment <br> ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholder's Suits <br> ☐ 190 Other Contracts <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Administrative Procedure Act, 5 USC 551 et seq; Marine Mammal Protection Act, 16 USC 1362 et seq; National Environmental Policy Act, 42 USC 4321

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** [＿＿＿＿] Check YES only if demanded in complaint    **JURY DEMAND:** YES ☐ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE  March 20, 2008    SIGNATURE OF ATTORNEY OF RECORD  _Rebecca J. Lunah_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed _only_ if diversity of jurisdiction was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the _primary_ cause of action found in your complaint. You may select only _one_ category. You _must_ also select _one_ corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.